# Henry W. Leman et al., Appellees, v. Lucius Teter, Appel=lant.

## Gen. No. 16,512.

1. RES JUDICATA—*when status of stockholder fixed.* If upon a proceeding to wind up an insolvent corporation an assessment is made and the party against whom such assessment is made is determined to have been a stockholder, such a question, after the exhaustion of the rights of review, is *res judicata* in a subsequent proceeding predicated upon a further assessment.

2. APPEALS AND ERRORS—*when findings of master not disturbed.* Findings of fact by a master approved by the court will not be set aside on review unless clearly and manifestly against the weight of the facts.

3. CORPORATIONS—*effect of stock subscriptions.* The subscriptions to the capital stock of a corporation are a trust fund for the benefit

of creditors and no valid arrangement can be made by which a subscriber can be released therefrom, and the stock liability continues until discharged by payment as against each subsequent assignee.

4. CORPORATIONS—*what does not discharge stock liability.* Merely returning a stock certificate does not discharge stock liability.

5. CORPORATIONS—*how insolvency of stockholders may be established.* In an action to dissolve an insolvent corporation, the insolvency of those owing a stock liability may be established *prima facie* by a return *nulla bona* for the purpose of determining the propriety of additional assessments against solvent subscribers.

Appeal from the Circuit Court of Cook county; the HON. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Affirmed. Opinion filed April 19, 1912. *Certiorari* denied by Supreme Court (making opinion final.)

WILLIAM E. O'NEILL, for appellant.

DAVID K. TONE, MORSE IVES and J. L. BENNETT, for appellees.

MR. PRESIDING JUSTICE BALDWIN delivered the opinion of the court.

On July 25, 1905, the Circuit Court of Cook County entered a decree upon a bill filed, winding up the affairs of the Continental Commercial Agency, a corporation of Illinois, and fixing its valid liabilities at the sum of $6,938.27, and costs of the proceeding. The bill was filed under section 25 of the Corporations Act, and the decree found that various persons had subscribed, but had not paid for stock in the corporation, which it found to be insolvent, and the decree found that it was necessary to pay its liabilities by levying an assessment against the stockholders on the unpaid portion of their stock. An assessment of 8½% was levied against the persons found to be stockholders. This assessment was sufficiently large that if collected from all the stockholders, it would have paid all the debts. Among the persons thus held liable as stockholders were appellant, Lucius Teter, Edward Van Reeth, Warren E. Colburn, and William A. Jones, each upon

20 shares of the par value of $2,000. The decree fixed the ultimate liability of each of the first three at $2,000 and that of Jones at a like amount less $711.25 paid by him on account of judgments, and found that nothing had been paid upon the stock held by any of them, except the credit allowed to Jones. The decree expressly found that no inquiry had been made as to the solvency of any of the stockholders, or whether any or all had property enough to satisfy their respective portions of the liabilities of the company, and further expressly provided that, in the event any of the defendants should not have sufficient property to satisfy their respective portions of such liabilities, then supplemental assessments should be made, etc., and retained jurisdiction of the parties and subject-matter for the purpose of carrying the decree into effect. The assessment of $8\frac{1}{2}\%$ against the stockholders thus amounted to $170 against appellant, Teter, and Van Reeth and Colburn respectively, and $103.48 against Jones.

From this decree appellant, Teter, and Van Reeth, Colburn and Jones and Anderson and a Mrs. Ivins severally appealed to this court. The several appeals were consolidated for hearing, and an opinion was filed in the first case, No. 12826, on the 28th day of December, 1906, affirming the decree of the court below. Thereafter appellant, Teter, and Jones, Van Reeth and Colburn, respectively, severally appealed to the Supreme Court, where the cases were again consolidated for hearing. After a hearing the Supreme Court held that the amount involved in each appeal was $170 and it, therefore, dismissed the appeals for want of jurisdiction. Teter v. Larson, 229 Ill. 585.

After their appeal had thus been dismissed, Teter, Jones, Colburn and Van Reeth paid the amounts of the several assessments of $8\frac{1}{2}\%$ against them, where-

upon complainants filed a petition, alleging the insolvency of all the other individuals who, with appellant, had been found liable as stockholders, and praying an additional assessment of 91½% against Teter, Jones, Colburn and Van Reeth. Upon this petition issue was joined, and the cause referred to a master, who heard the testimony and reported, finding these four liable and recommending that the assessment be made. Exceptions to the master's report were considered and overruled, and on the 14th of December, 1909, a decree was entered as recommended, making an assessment against Teter, Van Reeth, and Colburn of $1,830 each, and against Jones for $1,185.27.

By subsequent order of the court, the decree against Van Reeth, Colburn and Jones was compromised upon payment of $4,480.27, and Teter appealed from the decree. Upon this appeal Teter brings up the record upon which the first assessment of 8½% was made, and the record of the subsequent proceedings resulting in the present assessment of 91½% against him and asks that this court will review its former decision of December 28, 1906, as well as consider the proceedings had subsequent thereto. He strenuously urges that he never was in fact a stockholder in the company, and also that the claims of Hess and Gay (which are the basis of both assessments), should be set aside and, further, that it was not sufficiently shown in the proceedings, which resulted in the 91½% assessment, that the stockholders, other than the four, were insolvent.

Appellees insist that the former judgment of this court (in which the opinion was filed December 28, 1906), on the former appeal of Teter, is *res judicata* with reference to whether Teter was liable for unpaid stock of the Continental Commercial Agency, in the sum of $2,000, and that Teter is conclusively bound by the decree of the Circuit Court of July 25,

1905, finding him liable in that amount, said decree having been affirmed by this court.

They also insist that, even if those questions were not conclusively settled against appellant by the previous decision of this court, yet the record shows a clear case against him upon the merits, both as to his liability as a stockholder upon stock purporting to be, but in fact not paid, and as to the insolvency of such of the stockholders as were in the supplemental proceedings found to be insolvent.

It is difficult to see upon what grounds we could sustain the contention of the appellant that the previous decision of this court is not conclusive upon us on this appeal as to all matters which were then necessarily determined in its judgment. The parties are the same; the issues (except the questions of insolvency of other stockholders) are the same, and under the law, the former decision was a final adjudication between the parties upon the questions there involved. It is the policy of the law to seek to end litigation and to prevent parties from being compelled to relitigate matters which, in suits between them, have passed into final judgment. It is clear that at the very foundation of the first judgment against appellant, July 25, 1905, in the Circuit Court, and affirmed in this court, December 28, 1906, there was the question as to whether or not appellant was a stockholder in the insolvent company, and he was liable on his stock because it had not been paid. The issues were raised by the pleadings; proofs thereon were taken before a master who found that the company had no assets except the unpaid subscriptions to its capital stock; that appellant was in fact a stockholder to the extent of 20 shares of the par value of $2,000 upon which no part had been paid; and that an assessment of 8½% upon the capital stock was necessary, and that this assessment upon appellant's contingent liability

of $2,000 amounted to $170. These findings were approved by the Circuit Court after a hearing thereon, and a decree embodying them, and the conclusions clearly resulting therefrom, was entered by it; and this decree was in turn affirmed by this court. After this had been done and the appeal to the Supreme Court dismissed by it, appellant, having exhausted his remedy by appeal, acquiesced, and paid the assessment of 8½% upon his alleged holding of $2,000 par value of the stock of the insolvent company. All these proceedings,—the first assessment of $170, made by the decree of the court below, affirmed by this court, and subsequently by appellant's payment and satisfaction on April 10, 1908, of the judgment against him, were fundamentally based upon the proposition that appellant was a stockholder, which proposition we are now asked to consider as if it were still an open question. This previous judgment of this court is *res judicata*. Newberry v. Blatchford, 106 Ill. 584; West v. Douglas, 145 Ill. 164.

While we feel bound by the record thus made, and are of the opinion that the doctrine of *res judicata* applies, yet, at the earnest insistence of appellant, we have carefully considered the evidence heard before the master, upon which he made his finding and report, and upon which the lower court entered its decree of July 17, 1905, and giving to such findings and report of the master, after they have been approved and confirmed by the decree of the court, the weight to which the law says they are entitled, we cannot say that they are against the fair weight and preponderance of the testimony.

It appears that the Continental Commercial Agency was incorporated under the laws of Illinois for the purpose of conducting a mercantile reporting and collecting business, with a capital stock of $100,000, consisting of 1000 shares of $100 each. The certificate of

complete organization was issued to it by the Secretary of State on September 8, 1900, though it was not filed with the Recorder of Cook County until June 3, 1901; that from September 8, 1900, to November 1, 1901, it carried on its business in Chicago, when it became hopelessly insolvent,—its office furniture seized and sold by creditors,—and it ceased to do business; that complainants were creditors of the company which had no property or assets other than its unpaid stock subscriptions; that about September 6, 1900, the capital stock was subscribed for by W. S. Ivins and George W. Chamberlain, 1 share each, and for which they paid nothing, and one W. C. Anderson 998 shares; that on the 6th of September, 1900, Anderson submitted to the board of directors of the company, which included himself, Chamberlain and Ivins, and eight others, who may, with propriety, be referred to as "dummy" directors, a proposition in writing, stating that he had subscribed for 998 shares of the stock of the company; that he understood the most approved system then in use of conducting the business to be done by the company,—and offering to impart such knowledge to the officers and agents of the company in consideration of receiving his 998 shares of stock without other payment therefor. He further agreed to advance by way of loan to the company such sums of money as might be necessary to properly finance it. This board of directors, of which there was shown to be present, Chamberlain, who was that day elected president of the company, Anderson, who was elected second vice-president, and Ivins, who was elected secretary, and three of the other eight "dummy" directors, then and there not only voted to accept this offer of Anderson's and release him from all assessments on account of said stock, but, likewise, voted to relieve Chamberlain and Ivins from all assessments on account of their respective subscriptions for

one share each of the stock. At the same meeting, salaries of $1,300 per year were voted to the president, Chamberlain, the second vice-president, Anderson, and secretary, Ivins, the record of the meeting showing that upon the question of salaries each of the three officers mentioned, declined to vote upon his respective salary, though no such becoming modesty was shown when they assumed to relieve each other from all stock liability.

It appears that several certificates, each for 20 shares of the stock, were issued to Anderson, and were by him endorsed over to appellant, Teter, Van Reeth, Colburn and Jones respectively, under date of October 11, 1900, on which date a new certificate was issued to each of them for a like number of shares. It further appears by the records of the company that at an adjourned meeting of the stockholders of the company held October 10, 1900, the eight "dummy" directors resigned and Teter, Van Reeth, Colburn and Jones, with four others, were elected directors in their stead.

The record further shows a letter from Teter to the Agency, dated October 11, 1900, acknowledging receipt of its letter notifying him of his election to the board of directors of the company, and accepting the position. On the 17th of November, the records of the company show Teter present at a meeting of the stockholders, and, also, at a meeting of the directors at which last Teter was elected treasurer for the remainder of their fiscal year, and Teter testifies that he does not know how or when he received notice that he was elected treasurer, but thinks it was in January, 1901. On the 11th of February, 1901, Teter wrote to the directors of the company, tendering his resignation as treasurer and director of the company, and asking its prompt acceptance. To this the secretary of the company, Ivins, replied on the 9th of March.

1901, stating that a meeting of the directors would be held on the 11th, and that if he would return his certificate of stock, duly endorsed, the resignation would be acted upon at that meeting. Accordingly, Teter, under date of March 11th, returned the certificate of stock, properly endorsed, and his resignation as treasurer was accepted March 12th, and as director on the 15th of June, 1901. It fairly appears from the evidence that Teter was induced to have to do with this enterprise because of his desire to aid Chamberlain, who represented the prospective company, and was trying to induce men of honor and commercial standing to serve as directors, and if successful it would insure a position for himself. There is no direct testimony that Teter was promised stock in the company for his services, and, on the contrary, he testifies that nothing was said to him about it at any time previous to the time the stock was sent him. But it does appear that there was a definite arrangement to that effect with Jones, Colburn and Van Reeth,—and his own acts and omissions were such as to justify the master's conclusion that he was in fact a stockholder, but not one who became such for a *bona fide* consideration. Teter himself testifies that he thinks he received notices of some directors' meetings,—and, speaking of the certificate of stock, he says, "I had *forgotten* all about having a certificate of stock in my possession when I received the letter from the secretary." He could not have "forgotten" that which he never knew. Nor did he refuse to assign the certificate of stock, and repudiate such a relationship as he should have done if not a stockholder. As a director, and especially one who had promised to assume that relationship before the corporation had been organized, and as a treasurer, he owed it to himself and to creditors to know the condition of affairs and to participate in their manage-

ment, and though his kindly disposition to help his friend secure a livelihood reflects credit upon him, we are clear that his business indiscretion created the liability which has heretofore been adjudged against him.

The subscriptions to the capital stock of a corporation are a trust fund for the benefit of creditors and no valid arrangement can be made by which a subscriber can be released therefrom. Melvin v. Lamar Insurance Co., 80 Ill. 446; Bouton v. Dement, 123 Ill. 142; McNulta v. Corn Belt Bank, 164 Ill. 427.

The attempt to release Anderson's stock subscription could not avail against the statutes of this state, which provide, "No assignor shall be released from such indebtedness by reason of any assignment of his stock, but he shall remain liable therefor jointly with the assignee until the stock is fully paid. * * * Every assignee or transferee of stock shall be liable to the company for the amount unpaid thereon to the extent and in the same manner as if he had been the original subscriber." In construing this statute the Supreme Court has said: "The obligation created is that the stock is paid for, and it rests upon the original subscriber and every subsequent assignee until payment is made." First National Bank of Peoria v. Peoria Watch Co., 191 Ill. 128.

Under these statements of law it must be clear that by merely returning his stock certificate Teter did not relieve himself from debts subsequently incurred. Chrisman-Sawyer Banking Co. v. Independence Wool Mfg. Co., 68 S. W. 1026.

Coming now to the second branch of the case, in which appellant contends that the evidence as to the alleged insolvency of the other stockholders was insufficient to justify the master and the court below in their holdings. In his printed argument, he contends that no evidence upon this question was heard on

either side, other than executions issued to the sheriff against each alleged insolvent stockholder,—each bearing the return of the sheriff *"nulla bona"* and to each execution there was an alleged schedule of the personal property of such execution debtors.

Appellant concedes that such executions, returns and schedules would furnish adequate basis for a creditor's bill, where they would be received as admissions against interest by the debtor against whom relief is sought, but he insists that a different rule must be applied where, as in the case at bar, insolvency is to be established as a basis for a decree against third parties. Appellant contends that the insolvent parties should themselves be called and by their own testimony disclose their financial standing; or, that proof as to reputation in this regard would be admissible, and 2 Wigmore on Evidence, Sec. 1623, is cited in support of the proposition.

This contention of appellant is not without force. Upon examination the Illinois cases which hold that a return *nulla bona* was *prima facie* evidence that the defendant did not have sufficient property to satisfy the judgment, appear to be all cases of a creditors' bill, as suggested by appellant. At common law, no creditors' bill would lie if the principal defendant had property out of which a judgment could be collected.

At common law a return of *nulla bona* by a sheriff upon an execution established a *prima facie* case upon this question against the defendants. It was also true that at common law, the *prima facie* case made by the sheriff's return of *nulla bona* might be overcome by proof that the principal debtor had property out of which the judgment could be collected, in which event the sheriff must levy, and the bill be dismissed. And these considerations were available to and binding upon not only the principal defendant, but also upon others made parties defendant.

While we realize how imperfect the measure or rule by which to fix, even *prima facie,* the rights of litigants in large cities, yet we think the return *"nulla bona"* by a sheriff, made under the sanctity of his official oath, and in the performance of his regular duties is of quite as high probative value as the very loose, indefinite and unsatisfactory testimony as to the reputation of a party as to his insolvency. Moreover it appears that there was direct testimony as to such reputation, so far as affected Anderson and others. While the testimony is lacking in clear and positive statement, we think it sustains the master and the court below in holding that it was sufficient to make a *prima facie* case.

Finding no reversible error in the decree of the court below it will be affirmed.

*Decree affirmed.*